Max C. MURPHY, Administrator of the Estate of Mary Albertine Murphy, Deceased, Max C. Murphy, Individually, and Michael Burton Murphy and Rosemary Alice Murphy, Minors, by Max C. Murphy, Their Father and Next Friend, Appellants,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Appellee.

No. 18618.

United States Court of Appeals
Eighth Circuit.

June 14, 1967.

Bill Penix, of Penix & Penix, Jonesboro, Ark., Hartman, Hotz, Fayetteville, Ark., for appellants.

Walter G. Riddick, Asst. U. S. Atty., Little Rock, Ark., for appellee; Robert D. Smith, Jr., U. S. Atty., and Lindsey J. Fairley, Asst. U. S. Atty., Little Rock, Ark., on the brief.

Before VOGEL, Chief Judge, and BLACKMUN and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

This action was instituted by the Administrator of the estate of Mary Albertine Murphy, deceased, under § 205 (g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), to review a final decision of the Secretary denying a claim for a period of disability under § 216(i), prior to February 28, 1964, and for monthly disability insurance benefits under § 223 of the Act, 42 U.S.C.A. §§ 416, 423 prior to September, 1964. The District Court affirmed the Secretary's decision. The Administrator of the estate appeals, contending that the decedent became disabled on July 10, 1961.

The question raised on appeal is whether Mrs. Murphy was disabled within the meaning of the above statute on July 10, 1961. If that date were accepted, her two minor children would be entitled

to monthly benefits of about $50.00. See 42 U.S.C.A. § 402(d)(5); 42 U.S.C.A. § 414(b).

The decedent worked for the Southwestern Bell Telephone Company for nearly seventeen years. Prior to 1961, she was in excellent health and was described as a strong, healthy and energetic woman who enjoyed her work and her family, and who actively participated in the affairs of her church and community. In early 1961, she noticed a swelling of her right breast, complained of a loss of strength and energy and general physical weakness, and was absent from work because of her illness for forty-seven days during January and March. Her condition failed to improve, and in July of 1961, on the recommendation of her family doctor, Dr. Faris, she went on a disability leave. The leave of absence did not accomplish the desired results, and in January, 1962, she resigned from her job—again on her doctor's advice.[1]

There was no significant change in Mrs. Murphy's condition from the time of her resignation until July of 1964. During this period, she remained under the care of Dr. Faris, and was bedridden much of the time and under constant medication. She was, on occasion, able to do some light housework[2] with help from her husband. Heavy cleaning was done by outside help. She was unable to engage in outside social activities. She continually complained of breast pain and extreme fatigue.

In July, 1964, Dr. Faris hospitalized her for various (undisclosed) tests, all of which were negative. He then referred her to Dr. Latham, a psychiatrist, who examined her on July 23, 1964. Dr. Latham found her to be suffering from moderately severe psychiatric impairment, depressed, and desirous of receiving any treatment that could prove helpful. He hospitalized the decedent for a month, during which she received electro-

---

1. Dr. Faris submitted a report to the Hearing Examiner, dated March 10, 1965, which stated:

"This will certify that it is my professional opinion that the above named individual has been totally disabled for work since July 1961. At that time, she was carried on sick leave from her job with the telephone company. January 1st, 1962, she resigned her job at my direction because of physical disability and has remained so since that date."

He submitted a supplementary one, dated September 17, 1965, which stated in part:

"I was the physician for Mary A. (Mrs. Max) Murphy from December 1947 until July 23, 1964 and saw her periodically during this period of time.

\* \* \* \* \* \* \*

"Mrs. Murphy was a strong, healthy and energetic woman. In the spring of 1961 she began to complain of loss of strength and energy and general physical weakness. Because of her general run-down condition, which I felt was due to nervous causes and emotional strain, I recommended that she cease her job with the Telephone Company in July 1961. I felt that this might improve her condition and would allow her to regain her physical and mental health. I talked with her on the telephone and saw her occasionally after she ceased her job. She continued to have the

same general complaints of exhaustion and concern for herself. Upon examination I could find no physical cause for her weakened condition and I felt that she continued to be unable to work at her previous employment. The situation did not change except to become progressively worse until she was hospitalized by me at St. Bernard's Hospital in Jonesboro in July 1964. She remained in the hospital approximately seven days where I gave her various tests, all of which were negative.

"At the conclusion of this week in the hospital my best judgment was that Mrs. Murphy needed psychiatric treatment and I referred her with her consent to Dr. Frank Latham in Memphis, who hospitalized her and put her on a course of shock therapy.

"It is my medical opinion from my examinations of Mrs. Murphy and her visits to me from early 1961 up to the time that I referred her to Dr. Latham in July 1964, that she had continued to be unable to return to her work during this entire period at time."

2. Ability to do light housework is not a true test of ability to engage in substantial gainful activity. Jarvis v. Ribicoff, 312 F.2d 707 (6th Cir. 1963); Smith v. Gardner, 251 F.Supp. 262 (D.C.N.C. 1966).

shock treatments, drugs and psychotherapy. She continued to be treated as an out-patient during September, October and November of 1964. She never reached a point where the psychiatrist considered her to be making an adequate adjustment, and psychiatric impairment remained moderately severe.

In November of 1964, Mrs. Murphy sought additional medical advice from Dr. Orval E. Riggs. After an examination and hospitalization for additional tests, a diagnosis of inflammatory carcinoma of the right breast was made with a prognosis of an expected life span of perhaps six months.[3]

Mrs. Murphy filed an application for a period of disability and for disability insurance benefits on December 18, 1964, alleging that she became unable to work on July 10, 1961, at the age of thirty-seven. The application was initially allowed from August 31, 1964. However, upon reconsideration and after the Arkansas State Department for Social Security Administration Disability Determination had re-evaluated the evidence, a disability date of February 28, 1964, was established.

A de novo hearing, requested by Mrs. Murphy, was held before a Hearing Examiner of the Department of Health, Education and Welfare, on August 19, 1965, who confirmed the disability date of February 28, 1964.[4] This decision became the final decision of the Secretary

---

3. Dr. Riggs, who examined Mrs. Murphy, submitted a statement, dated August 21, 1965, which said in part:

"* * * On July 17 [1963],* I examined her and made the tentative diagnosis of carcinoma of the right breast and felt at the time that it probably was inflammatory carcinoma, since no specific mass could be palpated. * * * It was my opinion at the time that the disease was typical of inflammatory carcinoma and that her prognosis was very poor, the expected life span being perhaps only six months. * * * Over a year has now passed and Mrs. Murphy is still alive, however her disease persists. She has had nitrogen mustard therapy and X-ray therapy for palliation, but her prognosis remains exceedingly poor. I am forced by the circumstances of the past year to change my opinion regarding the nature of her illness. I do not believe that she has inflammatory carcinoma, but rather that she suffers from a more prolonged type of the disease. * * * I am inclined to feel at this time that Mrs. Murphy has suffered from her malignancy for a considerably longer period of time than any of us suspected at the time the diagnosis was made. *It is entirely within the realm of possibility that she may have had this illness for a period of five years or longer and that the supposed physicatric (sic) illness that she was originally thought to have may have been a manifestation of her underlying malignant disease.*" (Emphasis added.)
* It is clear that this date should be November, 1964.

4. This date was apparently fixed on the strength of a written report filed by a departmental examiner which was based on a conversation with a departmental medical consultant, Dr. Hall. It is significant to note that Dr. Hall neither examined Mrs. Murphy nor appeared as a witness. The Fourth Circuit, in commenting on such testimony, recently stated:

"* * * We reach the conclusion that, in view of the opinion evidence as to the existence of a disability, combined with the overwhelming medical facts, the uncontradicted subjective evidence, and claimant's vocational background, the opinion of a doctor who never examined or treated the claimant cannot serve as substantial evidence to support the Secretary's finding. Indeed, Dr. Glendy admitted upon cross-examination that he was 'sure a family physician is always more familiar with a patient than one that is just looking at the objective evidence we have on paper.'" Hayes v. Gardner, 376 F.2d 517, 520-21 (4th Cir. 1967).

Dr. Faris found no cancer in July of 1964; Dr. Riggs stated the cancer had possibly existed for five years; and Dr. Wisdom, who examined the decedent in November of 1964, was of the opinion that the cancer had existed for many months but stated he could not determine its date of onset with any degree of accuracy. It thus appears that the February, 1964, date fixed by Dr. Hall, and accepted by the Secretary, was entirely speculative.

of Health, Education and Welfare, subject to judicial review, when the Appeals Council denied Mrs. Murphy's request for review on November 22, 1965.

Mrs. Murphy died on the day the Appeals Council adversely decided her case.

The standards that this Court will apply on review of the Secretary's findings have been developed in a series of recent decisions: Marion v. Gardner, 359 F.2d 175 (8th Cir. 1966); Brasher v. Celebrezze, 340 F.2d 413 (8th Cir. 1965); Celebrezze v. Sutton, 338 F.2d 417 (8th Cir. 1964); Celebrezze v. Bolas, 316 F.2d 498 (8th Cir. 1963). They are applied here.

■ To establish a statutory disability, it is necessary that there be: (1) a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months,[5] (2) an inability to engage in any substantial gainful activity by reason of the impairment. 42 U.S.C.A. § 423; Easttam v. Secretary of Health, Ed. and Welfare, 364 F.2d 509, 511 (8th Cir. 1966); Nichols v. Gardner, 361 F.2d 963-965 (8th Cir. 1966); Celebrezze v. Bolas, supra, 316 F.2d at 501. We shall consider (2) first.

■ The decedent's ability to engage in substantial gainful employment from July 10, 1961, to February 28, 1964, is not seriously questioned by the appellee. Nor is there evidence to support such a finding. The decedent, her husband, her job supervisor and her neighbors all testified that the claimant was unable to continue at her former job with the telephone company, and affirmed her contention that she was unable to do any other work of a substantial gainful nature. Her family doctor stated categorically that she was unable to return to work during the entire period.

No evidence was presented by the appellee to establish that the decedent could have continued her work with the telephone company or that she could have performed other gainful employment. The appellant clearly sustained her burden of establishing her inability to engage in any substantial gainful employment. See Davidson v. Gardner, 370 F.2d 803 (6th Cir. 1966); Celebrezze v. Sutton, supra; Lackey v. Celebrezze, 349 F.2d 76 (4th Cir. 1964).

Nor did the appellee present any testimony tending to show that the claimant's failure to seek gainful employment was related to a desire on her part not to be so employed. While the Secretary speculated in his brief that the claimant may have quit work in 1961 because her husband had just graduated from college, it was conceded on oral argument that there was no evidence to support such speculation. Counsel at argument also conceded that the record was void of any evidence indicating that Mrs. Murphy was malingering. We turn, then, to a consideration of the relevant question: Did Mrs. Murphy have a medically determinable physical or mental impairment as of July 10, 1961?

■ In finding to the contrary, the Secretary concluded that the decedent did not have the required impairment from July 10, 1961, to February 28, 1964, because the existence of the cancer during this period had not been properly established. He justified his position by stating:

" * * * the Act requires * * * that * * * the existence of a condition must be established by objective medical, clinical or laboratory evidence. General conclusions or naked medical diagnoses are insufficient. The record must contain supporting medical findings which are sufficiently precise and detailed to warrant a determination that the impairment is

5. In 1965, Pub.L. 89–97 § 303(a) (2), 79 Stat. 286, deleted the language "to be of long-continued and indefinite duration" and substituted therefor the language

"which has lasted or can be expected to last for a continuous period of not less than twelve months; or * * *." The amended language applies here.

severe. Johnson v. Flemming [D.C.], 188 F.Supp. 447; Jacobson v. Flemming [D.C.], 186 F.Supp. 936; Liles v. Flemming [D.C.], 176 F.Supp. 303; Butler v. Folsom [D.C.], 167 F.Supp. 684."

The Secretary apparently relied on 20 C.F.R. § 404.1510(a) and (b),[6] as well as the cited cases, as precedent for his decision. We do not read either the cases or the regulations as requiring such a holding.[7]

6. The Regulations, Section 404.1510(a) and (b) read:

"(a) In order to establish that a medically determinable physical or mental impairment (see § 404.1501(a) or (b) (1)) is present there should be evidence that medically discernible anatomical, physiological, biochemical or psychological aberrations exist. Allegations of inability to work as a result of impairment such as dyspnea (shortness of breath), pain, * * *, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical and laboratory diagnostic techniques. An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques.

"(b) The medical evidence should be complete enough to support an independent diagnostic, therapeutic and prognostic conclusion by the State agency or the Social Security Administration, as the case may be, and form a clear picture of the individual's functional limitations (e. g., where dyspnea (shortness of breath) is reported, the level of activity at which it occurs should be described). The impairment should be etiologically (cause), pathologically (structural change), physiologically (functional), psychologically, and therapeutically (treatment and response)."

These regulations may serve as a guide but cannot, to the extent that they impose requirements not set forth in the statute, act as a complete barrier to a finding of disability that would be made in their absence. Marion v. Gardner, 359 F.2d 175 (8th Cir. 1966).

7. The reliance on Johnson v. Flemming, 188 F.Supp. 447 (D.C.Or.1960); Jacobson v. Flemming, 186 F.Supp. 936 (D.C. N.Y.1960); Liles v. Flemming, 176 F. Supp. 303 (D.C.Ark.1959); and Butler v. Folsom, 167 F.Supp. 684 (D.C.Ark.1958), is misplaced.

In *Johnson*, the Hearing Examiner pointed out that while a diagnosis of rheumatoid spondylitis had been made by the plaintiff's personal physician, the diagnosis was unsubstantiated by clinical findings, and stated that what findings were available were inconsistent. The District Court, in affirming the Referee's decision, based its conclusion on the fact that there was conflicting evidence as to the extent of the plaintiff's physical impairment and stated it was the responsibility of the trier of fact to resolve such conflicts.

In *Jacobson*, the Court in discussing the testimony stated 186 F.Supp. at page 937:

" * * * Assuming the accuracy of Dr. Gross's opinion, namely that plaintiff was prevented from engaging in any substantial gainful activity *by reason of his neurosis, that, if proved, might be sufficient basis for the claimed disability. But the fact is, there is no evidence at all in the case even tending to show that plaintiff had such neurosis aside from the naked opinion of the doctor.* Furthermore, the government offered at its expense to have a psychiatrist make an appropriate psychiatric examination, but that was refused by plaintiff and plaintiff's counsel." (Emphasis added.)

In *Liles*, one of the physicians who examined the claimant found that he could engage in certain selected sedentary activity and the Referee accepted this estimate. The District Court, in affirming the Referee, did not discuss the question of whether the impairment had been established by clinical and laboratory diagnostic techniques.

In *Butler*, the Court, 167 F.Supp. at page 689 declared:

"The Referee did not base his conclusion upon any theory that the plaintiff's impairment was purely subjective. In other words, the Referee apparently gave full weight to any impairment which might have arisen by virtue of what the Veterans Administration diagnosed as 'conversion reaction' or hysteria. In short, the Referee did not treat the plaintiff's impairment as being any less disabling because it was based in whole or in part upon a subjective or neurotic symptom. Thus, the plaintiff was given the full benefit of any doubt which might have been created by the diagnosis of chronic conversion reaction and hysteria."

■ Unfortunately, cancer detection has not yet reached the point where an early detection by laboratory procedures is always possible. Indeed, in the present case, as Doctors Wisdom and Riggs pointed out, it was difficult, if not impossible, to determine the date of its onset even after the disease has been detected and has reached the point where it could no longer be controlled. A defect, however, does not cease to exist merely because it is diffcult to prove. See, e. g., Bramlett v. Ribicoff, 298 F.2d 858 (4th Cir. 1962). Nor is the disability contemplated by the Act restricted to that which is subject of proof of laboratory findings. Page v. Celebrezze, 311 F.2d 757 (5th Cir. 1963); Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963).

■ While we believe that the record as a whole would have sustained a finding that Mrs. Murphy had a disability because of cancer as early as July 10, 1961, it is not necessary for us to determine whether the record compelled it.

The determination by Dr. Faris that the decedent had "suffered a loss of her physical and mental health" and was in a run-down condition, in July of 1961, "due to nervous causes and emotional strain," was a medical determination of "physical and mental impairment" of her health.

This was not a naked medical opinion. It was fully supported (1) by the deceased's testimony that she was constantly fatigued to the point of exhaustion, that her breast was swollen and painful,[8] and that she was bedridden much of the time and under constant medication; (2) by the testimony of the decedent's supervisor that the deceased left her job because she was tired, nervous, in pain and unable to work; and (3) by the testimony of the deceased's husband, friends and neighbors that the deceased was constantly tired, lacked energy, was continually complaining of pain and soreness in her breast, and was bedridden much of the time.

8. This Circuit and others have recognized that pain can be a factor in creating disability. See Easttam v. Secretary of Health, Ed. and Welfare, 364 F.2d 509 (8th Cir. 1966); Ribicoff v. Hughes, 295 F.2d 833 (8th Cir. 1961).

In Celebrezze v. Warren, 339 F.2d 833 (10th Cir. 1964), the Court, at 838, stated:

"The lack of medically determinable organic cause for the existence of Warren's pain appears to have been one of the significant factors considered by both the examiner and the Appeals Council. However, a defect does not cease to exist merely because it is difficult of proof. * * * The existence of headaches should not be disregarded because of a technicality. Bramlett v. Ribicoff, 4 Cir., 298 F.2d 858. The disability contemplated by the Act is not restricted to that which is subject of proof by laboratory findings. Page v. Celebrezze, 5 Cir., 311 F.2d 757; Hayes v. Celebrezze, supra; Butler v. Flemming, supra, 5 Cir., 288 F.2d 591. In Page v. Celebrezze, supra, 311 F.2d at pages 762–763, it is said:
* * * * * * *
'In rejecting the idea that pain genuinely held, felt and experienced

has to be substantiated objectively to satisfy the statutory standard of a "medically determinable physical or mental impairment," we have just recently said: "But modern medicine is neither so scientific nor so helpless today that it either does, or must, evaluate only objective factors." Hayes v. Celebrezze, 5 Cir., 1963, 311 F.2d 648.'"

In Davidson v. Gardner, 370 F.2d 803, 809 (6th Cir. 1966), the Court quoted approving the following from Ross v. Gardner, Secretary, 365 F.2d 554 (6th Cir. 1966):

"Pain, unaccompanied by any objectively observable symptoms, may be so real and so intense as to be disabling, and will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.)."

See also Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.1962); Lewis v. Flemming, 176 F.Supp. 872 (D.C.Ark.1959).

Equally important, the doctor's conclusions were supported by the past medical history of the decedent and a complete absence of evidence indicating malingering as well as evidence showing that she fully cooperated with her doctors in an effort to regain her health.

Furthermore, Dr. Faris' conclusions draw support from Dr. Latham's findings that Mrs. Murphy was suffering from severe psychiatric impairment and depression, a medically determinable mental impairment within the meaning of the statute. Davidson v. Gardner, supra; Marion v. Gardner, supra; Hill v. Celebrezze, 233 F.Supp. 298 (D.C. S.C.1964); Hanna v. Celebrezze, 233 F. Supp. 239 (D.C.Ark.1964). While this specific diagnosis was not made until 1964, its severity as of that date adds substance to Dr. Faris' earlier diagnosis. The fact that Dr. Faris' report failed to set forth his conclusions in language that may have more precisely met the requirements of the Secretary's regulation should not operate to deny the decedent and her children of the benefits to which they are entitled under the Act.

Dr. Faris' medical opinion is not repudiated by any substantial evidence to the contrary. Indeed, it is strongly supported by other evidence, and as such, it should not be lightly set aside. Kohrs v. Flemming, 272 F.2d 731 (8th Cir. 1959).

The medical evidence, the subjective evidence of disability, the corroborating evidence of the decedent's spouse, the work history of the decedent, and the evidence produced by her employer and acquaintances all show *nemine contradicente* that the decedent was disabled within the meaning of the statute.

We reverse and remand with instruction to the lower court to take those steps necessary to establish July 10, 1961, as the date of disability for all relevant purposes under the Social Security Act.