**Mary E. TEAGUE**

v.

**John GARDNER, Secretary of Health, Education and Welfare.**

**Civ. A. No. 5994.**

United States District Court
E. D. Tennessee, N. D.

Jan. 2, 1968.

John B. Rayson, Hugh W. Morgan, Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

Plaintiff, a woman 52 years of age, filed an application to establish a period of disability and for disability insurance benefits on November 8, 1965, claiming that she first became unable to engage in substantial work in July, 1965. At that time, she was working for People's Department Store in LaFollette, Tennessee, having commenced her work at that store either in September or October, 1964. She was making $40.00 per week. Her claim was disallowed by the Division of Disability Operations of the Social Security Administration. She then requested reconsideration of the initial determination which was disallowed. Thereafter, she filed a request for a hearing on September 6, 1966 asserting that she was too weak to work and her medical condition did not permit her to do anything.

The Hearing Examiner found that she was not disabled within the meaning of the Social Security Act, as amended. He stated:

"Claimant, a 51-year old woman is shown to be a tense, nervous, sometimes depressed individual. She claims she is unable to work because of arthritic pains, colitis, and extreme nervousness. Looking first at her physical ailments, the opinions of all of the examining physicians, with the exception of claimant's personal phy-

sician, are essentially consistent. They all agree, in essence, that claimant is only mildly impaired as a result of a moderate degree of rheumatoid arthritis in some of her joints, and that no serious restrictions are shown to exist in her ability to move about and perform the functions associated with normal living and working activities. Claimant's family physician suggests that she may be suffering from a psychosis, however, psychiatric evaluation clearly shows that claimant is not suffering from a psychosis, nor is it even suggested that she has a severe degree of psychoneurosis. It is shown that she is depressed, and that she demonstrates anxiety on occasion, but it is also shown that she is essentially in good mental health. In short, claimant presents certain classical symptoms of anxiety and depression, but she manifests no psychotic or severe psychoneurotic behavior. Claimant has never been institutionalized or hospitalized for any mental disorder, and shows no evidence of disorientation or disturbed thought processes. Referring to claimant's personal physician's conclusion that she is unable to carry on any occupation, Section 404.1526 of the Regulations, set forth above, clearly reserves the ultimate question of whether claimant is disabled from pursuing substantial gainful activity to the Secretary. The medical evidence indicates that claimant's physical ailments do not impose upon her any serious limitations of functions and do not approach the level of severity necessary to sustain a finding of disability. While the evidence indicates that claimant has some degree of physical impairment, and demonstrates a slight degree of psychoneurotic behavior, it has not been shown that claimant is unable to engage in substantial gainful activity. On the contrary, it is evident that claimant's contentions with respect to the limited activities she is able to pursue are substantially exaggerated.

She is able to perform many physical functions which do not equate with a finding of disability. No reason has been shown, in the Hearing Examiner's opinion, why she cannot return to work in her former occupations as a sales clerk, or as a beauty shop operator, assuming proper motivation.

"The Hearing Examiner concludes that claimant has failed to sustain the burden of proving, by a preponderance of the credible evidence, that her impairments, either singly or in combination, are of such severity as to prevent her from engaging in any substantial gainful activity."

The sole question involved is whether or not there was substantial evidence to support the decision of the Hearing Examiner that plaintiff was able to engage in substantial gainful activity.

Plaintiff testified at the hearing that she was unable to work due to rheumatoid arthritis, colitis, a nervous condition and pressure in her bladder. She complained of pain in the middle of her spine and in her fingers, arms and shoulders. She stated that she had difficulty in reaching and stretching. She complained of indigestion which arose by reason of some of the medicine she was taking. The pain pills prescribed for her arthritis did not relieve the pain. She tired easily and was weak, had pains in the colon while bending. She stated that at times it was hard to get her breath. That if she drives a car from five to fifteen minutes she has cramps in her legs. She drives a car from her home to town, which is about three or four miles. She further stated she did not do any heavy house work, but does light house work such as making beds, etc.

She further stated that she could not iron or sew because of nervousness and cannot lift anything that is heavy. For recreation, she sometimes goes fishing with her husband. She takes medicine daily. Recently, she has had trouble with her spine which causes pain when she

stretches, lifts or raises her arms. She also complains of bursitis.

Plaintiff has a high school education and her vocational experience has included light work. She testified that she worked approximately ten years as a beautician and that she was self-employed part of the time. Her next work was as a sales clerk in department stores. In addition to selling merchandise, this job included pricing and tagging the merchandise, helping to take inventory and assisting with the dressing and cleaning of the windows. She also worked for approximately six months on an assembly line where she bradded something on wires and made blackout lights. She was of the opinion that she could get a job at People's Department Store at a salary of $45.00 per week if she was able to work.

Plaintiff was examined on September 8, 1965 by Dr. William O. Miller, a urologist of Knoxville, who made the following findings:

"1.  Mild systourethrocele.

2.  Carcinoma of the cervix, post-irradiation, old.

3.  Atrophic urethrotrigonitis.

With an adequate bladder capacity and no evidence of bladder base tenderness or urethral difficulty, I would be most hesitant to feel that Mrs. Teague's bladder complaints are those referable to irradiation cystitis. These usually have a decrease in bladder capacity and will have pain induced upon filling as is seen in interstitial cystitis. Hopefully, she should have some response to her irritative symptoms with local vaginal estrogens and Urised for flare-ups of irritative symptoms; of course, antibiotics if indicated by an infected urine."

Plaintiff was admitted to the LaFollette Community Hospital at LaFollette on October 7, 1965 and was discharged from the hospital on October 15, 1965. The hospital records show that she com-plained of pain in her left lower quadrant and mucous colitis. Her hospital discharge stated: "Probable colitis. Rheumatoid arthritis."

Doctor James Crutchfield, a general practitioner of LaFollette, reported on November 10, 1965 that he examined plaintiff for her present illness on August 16, 1965 and that she was seen by him from two to three times weekly with the date of his last examination shown as November 8, 1965. He found as follows:

"a)  Tender swelling of the proximal IP joints of all fingers with full range of motion. Painful at the extremes of motion. Approximately 25 percent limitation of flexion of lumbar spine with tenderness to palpation over the spinas processes of the lumbar vertebrae."

Dr. Crutchfield was of the opinion that plaintiff was unable to engage in a full day's work because of pain. He stated that walking aggravated pain in her back and side and that use of her hands resulted in a flare-up of the arthritis in the hands.

Plaintiff was examined by Dr. William Law, a specialist in internal medicines, at Government expense, in December, 1965. He stated that her primary problem most recently was rheumatoid arthritis. She thought that there may have been some swelling of the joints, but Dr. Law observed that "as I go into the details of this, it apparently was extremely minimal, if at all, and she has never had any heat or redness." She also complained of colon trouble. She was extremely nervous and had tension headaches at times and also tended to get a little dizzy at times. She was short of breath or gets weak and tired and trembled after most any mild exertion such as one flight of steps or two blocks of level walking. She smokes one-half to a pack of cigarettes per day. Dr. Law's impression of plaintiff was that she was an extremely nervous wo-

man. He observed that she had a low pain threshold and jumped during many aspects of the physical examination. He stated:

"It is my feeling that there is very little objective evidence of organic disease in this woman to explain her symptoms. I doubt that psychiatric care would be either feasible or helpful and I would think that she is able to work if such is indicated. I would think that salicylates taken with antacids or milk, etc. would be most effective in helping her musculoskeletal aches and pains and think that steroids and perhaps even gold are contraindicated, particularly in view of the recent itching."

Doctor Joe B. Johnson, a radiologist, examined plaintiff at the request of Dr. Law. He was of the impression that there was:

"1. Demineralization of the lumbar spine.

2. Depression of the superior cortical plate and irregularity of anterior margin of L.1 involving D.12 through L.3.

3. No other abnormality of the lumbar spine seen."

Doctor Burgin H. Wood, a general practitioner, reported in January, 1966, that he had treated plaintiff since 1959 for various complaints. He stated that in addition to her physical complaints, that she had developed a mental depression almost to the point of suicidal intent. "Because of the changes secondary to radiation therapy in the genitalia, she has completely unsatisfactory sexual relations and as a result of course her marital life is interfered. There is friction in the home on this account I am sure and actually I feel that she is in need of psychiatric treatment though I have been unable to persuade her of this need. It is my opinion that she is probably bordering on a psychosis." His diagnosis was as follows:

"1. Carcinoma of the Cervix, post-irridation with an irridation proctitis and trigonitis

2. Rheumatoid Arthritis

3. Acute Mental Depression, bordering on psychosis. Post-irradiation proctitis and mucous colitis."

Doctor John H. Wolaver, a psychiatrist, examined plaintiff at the expense of the Government in March, 1966. He diagnosed her trouble as: "Pyschophysiological Reaction, Gastro-intestinal and Genito-urinary Types, with little observable anxiety and with strong paranoid character traits all of which is of sufficient intensity to resemble a Schizophrenic Reaction of the ambulatory type." He felt her prognosis was poor and suggested supportive treatment consisting of drugs and care by local physician with possible hospitalization at a later date. He was of the opinion that she was permanently and totally disabled.

Doctor H. Stuart Bacon, a psychologist, evaluated plaintiff's condition from a psychiatric standpoint on June 28, 1966. A summary of his findings is as follows:

"In summary, Mary E. Teague is a 50 year old white married female unemployed store clerk with a high school education who is of average intelligence, reads on the ninth grade level, does arithmetic on the fifth grade level, does not appear to have any brain damage nor to be psychotic, but is an extremely anxious, somewhat depressed individual who has many unresolved conflicts and much repressed unconscious hostility and doubts about her identification with the feminine role. Psychotherapy is not indicated, but symptomatic medication might afford her some relief. I feel that she is capable of managing benefit payments in her own interest. As far as her emotional problems are concerned, supportive psychotherapy and symptomatic medication should enable her to participate in any rehabilitation or occupational program with a fair degree of probability of success. She could be encouraged to resolve the dependence-independence conflict in the direction of more independent orientation,

with permission from the authority figure for her to express hostility in an appropriate channel, without feeling much guilt."

Doctor Zelma L. Herndon, a psychiatrist, made an evaluation of plaintiff at Government expense in July, 1966. She diagnosed her condition as psycho-physiological musculoskeletal reaction, chronic, competent in an emotionally immature, unstable personality. She stated:

"It is doubtful that she will improve very much because she has much to gain by having crippling arthritis which gives her a lot of attention. One cannot help but feel she is not motivated to be usefully or gainfully employed again—she rather enjoys dependent status. Therefore, her prognosis would be poor for any responsive treatment. Her inability to work is likely to be due to her own lack of drive and motivation urge, rather than behavior or disability that is apparent that would be incapacitating. She is using her complaints as an escape for assuming responsibility because of her emotional instability. She exaggerates her complaints."

Plaintiff's organic impairments alone may not be sufficient to prevent her from engaging in substantial gainful activity, but her organic troubles combined with her psychoneurosis are sufficient to prevent her from engaging in a gainful occupation.

The Examiner either ignored or discounted the evidence of the psychiatrists when he found that plaintiff "is essentially in good mental health."

Doctor Wolaver found that she had "strong paranoid character traits all of which is of sufficient intensity to resemble a Schizophrenic Reaction of the ambulatory type."

A clinical psychologist was of the opinion that she was an "extremely anxious, somewhat depressed individual who has many unresolved conflicts and much re-pressed unconscious hostility and doubts about her identification with the feminine role. Psychotherapy is not indicated, but symptomatic medication might afford her some relief * * *. As far as her emotional problems are concerned, supportive psychotherapy and symptomatic medication should enable her to participate in any rehabilitation or occupational program with a fair degree of probability of success."

Doctor Herndon, another psychiatrist, observed that she was slightly tremulous and that she had average intelligence. Dr. Herndon stated that "Her inability to work is likely to be due to her own lack of drive and motivation urge, rather than behavior or disability that is apparent that would be incapacitating. She is using her complaints as an escape for assuming responsibility because of her emotional instability. She exaggerates her complaints."

Doctors Wolaver, Herndon and Bacon were best qualified to evaluate plaintiff's mental impairments. Doctor Wolaver was definitely of the opinion that she was permanently and totally disabled. Her neurotic troubles cause her to go into stages of deep depression. Dr. Wood observed that at times she almost reached the point of suicidal intent.

Although Dr. Herndon was not as definite in her evaluation as was Dr. Wolaver, she did say that plaintiff was a highly nervous woman and was unable to work due to lack of motivation for work. Lack of motivation for work may be a symptom of psychoneurosis. Both Dr. Herndon and the Hearing Examiner were of the opinion that she had a tendency to exaggerate. Exaggeration may be another symptom of psychoneurosis. Dr. Herndon did not say that she was able to work.

Doctor Bacon stated that plaintiff has average intelligence and reads on the ninth grade level, but her arithmetic was on the fifth grade level and she is an extremely nervous, anxious and depress-

**48**

ed individual. He did not say that she was able to work. He did say that with supportive psychotherapy and symptomatic medication she should be able to participate in any rehabilitation or occupational program with a fair degree of probability of success.

All of the medical testimony relating to plaintiff's psychosomatic condition shows that she is unable to engage in gainful activity.

The three doctors who testified as to plaintiff's psychoneurosis or psychosomatic impairments agreed that her prognosis was poor. The Government paid for the services of these doctors. Dr. Wood, a general practitioner, who treated plaintiff many times over a substantial period of time, felt that she had a serious and disabling emotional disturbance. His testimony is entitled to more consideration than the testimony of doctors who merely examine. Combs v. Gardner, 382 F.2d 949 (C.A.6); Sayers v. Gardner, 380 F.2d 940 (C.A.6); Walston v. Gardner, 381 F.2d 580 (C.A.6); Murphy v. Gardner, 379 F.2d 1 (C.A.8); Davidson v. Gardner, 370 F.2d 803 (C.A.6).

There is no substantial evidence in the record to support the finding and conclusion of the Hearing Examiner that the evidence fails to establish that plaintiff's impairments prevented her from engaging in substantial gainful activity for any continuous period of time.

This Court finds and concludes that plaintiff's organic impairments combined with her mental impairments, render her unable to engage in any substantial gainful activity. See Miracle v. Celebrezze, 351 F.2d 361, 375 (C.A.6); Branham v. Gardner, 383 F.2d 614 (C.A. 6, September 8, 1967); Colwell v. Gardner, 386 F.2d 56 (C.A.6, November 17, 1967.)

Plaintiff's motion for summary judgment is, therefore, sustained.