**Charles Luttrell COMBS, Plaintiff-Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant-Appellee.**

**No. 17189.**

United States Court of Appeals
Sixth Circuit.

Sept. 25, 1967.

Alva A. Hollon, Hollon & Hollon, Hazard, Ky., for appellant.

George I. Cline, U. S. Atty., G. Wix Unthank, Asst. U. S. Atty., Lexington, Ky., for appellee.

Before PECK and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

Appellant brought this action in the United States District Court for the Eastern District of Kentucky under section 205(g) of the Social Security Act, 42 U. S.C. § 405(g), following the final decision of the Secretary disallowing appellant's application for disability insurance benefits and for a period of disability pursuant to sections 223 and 216(i) of the Act respectively. The District Court held that the Secretary's findings that appellant was not disabled within the meaning of the Act were supported by substantial evidence, and dismissed the action. Appellant here seeks review of the District Court's determination.

Appellant was a forty-one year old man with an eighth grade education at the time he filed his application for disability benefits and a period of disability on April 30, 1963. The alleged impairments

set forth in the application consist of arthritis of the spine and a nervous condition.

As a relatively younger man, appellant's employment consisted primarily of heavy manual labor, loading coal by hand in the mines for several years, and thereafter working with a railroad section crew for approximately nine and one-half years. While working for the railroad in 1952, appellant suffered a skull fracture when a piece of slate which was thrown from a railroad car struck him in the head, and, as his family doctor stated in a report to the Social Security office, "he has never been up to par since."

Although claimant complained of headaches, and neck and back pains following the 1952 accident, he returned to work at the railroad. Because he "just kept getting worse and worse, the burning in back of my head, my back—," appellant quit this job in 1954. In 1958, appellant started work as a cemetery caretaker, cutting grass with a power mower and cleaning markers. After being laid off this job in the latter part of 1961 for business reasons unconnected with his health or ability to work, appellant was employed as custodian, or janitor, of a local high school where he did no heavy work. On December 27, 1962, appellant quit work at the school because of his alleged impairments, and he has not been employed since.

Claimant's principal complaints are pains in the lower back, head and neck, nervousness, and shortness of breath. Although appellant testified that he had never injured his back, he explained that the pain now originates near a lump to the right side and a little below the base of the neck and spreads "into the back of my head and then spreads down towards the back." The pain allegedly commences whenever appellant exerts himself, except for "real light" work, and he starts shaking, his back and legs become numb, he becomes dizzy and occasionally he will "pass out," or fall into a semiconscious state. Complaints somewhat similar to these were diagnosed as "post-concussion syndrome" in 1952.

Four witnesses testified on behalf of appellant at the administrative hearing: a co-worker at the high school, a neighbor, and two brothers who are also neighbors. Of these witnesses, all but one of the brothers stated that they had personally observed incidents where appellant passed out and had to be helped home, the neighbor having observed this on three or four occasions. Appellant's co-worker testified to an incident occurring when this witness was working day shifts at the school and appellant the night shift, where he came to work on the morning of December 27, 1962 (the last day appellant worked), found appellant in a semiconscious condition unable to move or help himself, and then, with the assistance of his son whom he called, took appellant to the hospital. Appellant explained that this last spell started while he was mopping and waxing the floors.

The sole issue before this court is whether there is substantial evidence on the record as a whole to support the Secretary's findings that appellant is not "disabled" within the meaning of the Social Security Act. 42 U.S.C. § 405(g). A claimant is thus disabled whenever he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 423. In accordance with this statutory definition, it is apparent that the existence of an impairment does not in and of itself warrant compensation under the Act.

Turning to the medical evidence, Dr. Pigman, a general practitioner who attended appellant prior to his application for benefits, diagnosed appellant's impairments as post-compression syndrome, nervousness (severe), arthritis of spine, elbow, shoulders and fingers, and psychoneurosis. Dr. Pigman also noted tachycardia and "some respiratory disturbances," both of which he attributed to the nervousness. Appellant's condition was considered static and Dr. Pigman con-

cluded that appellant would "never regain his status for work and must be classified as permanently disabled."

Dr. Williams, who also saw appellant prior to his application for benefits, by report dated February 5, 1963, diagnosed appellant's ailments as "post-concussion syndrome, some emphysema of the lungs and probably hypertrophic arthritis of the spine with severe psychoneurosis with conversion and anxiety symptoms." Dr. Williams concluded that appellant was "disabled for work, possibly permanently, but certainly for a period of months."

Attached to Dr. Williams' report of February 5, was a copy of a consultation he did on appellant on June 22, 1959, at which time appellant was hospitalized with a "spontaneous pneumo-thorax on the right with about 70% collapse of the lung." A hospital report from Mt. Mary Hospital shows that a "thuracintisis"[1] was performed in 1959 and appellant's condition on discharge was improved. As indicated above, appellant continues to complain of some respiratory difficulties.

Dr. Keith, a neurological specialist, examined appellant on July 1, 1963. With respect to appellant's back, Dr. Keith noted:

"He has good flexion and is able to touch his toes and has good extension and lateral bending. The jugular compression test is negative. The straight leg raising test is negative. There is no atrophy of either calf. There is no sensory impairment in either foot. * * *"

Although the neurological examination was essentially negative, Dr. Keith noted that appellant was "so nervous that both hands, neck and face all shook. At times he was almost in tears. He appears to be alert although somewhat distracted. * * *" The final impression was:

"(1) I think this man is suffering from a severe anxiety neurosis.

"(2) I can find no definite evidence of any neurological abnormalities.

"(3) I do not think these are seizures this man is having, but attacks of anxiety. At one time during the examination when I was testing him, I felt his pulse and his pulse rapidly went up to around 120.

"(4) This does not fit either the pattern of a post-concussion syndrome."

In a report dated October 9, 1963, Dr. Williams stated that the "neurological examination is essentially unchanged." Diagnosis was severe psychoneurosis with conversion and anxiety symptoms, pulmonary emphysema with emphysematous blebs and bullae which is definitely functional class II and possible class III, and hypertrophic arthritis of the spine. A pulmonary function study and a psychiatric evaluation were recommended.

On October 11, 1963, Dr. Friesen, an orthopedic specialist, reported that a clinical examination revealed "absolutely no positive objective findings, other than a positive Romberg finding" the significance of which was not mentioned, and which the Secretary notes is a finding of a swaying of the body when standing with feet close together and eyes closed. Dr. Friesen stated that appellant's "range of motion in his back, neck, upper extremities and reflexes in the upper extremities and lower extremities * * * are negative in findings." After summarizing appellant's medical history, and recommending that he be examined by a neurosurgeon for his present condition, Dr. Friesen stated: "If patient's history is accurate, I believe that probably he is not able to be employed." While the Secretary emphasizes the words "If" and "probably," arguing that the statement is thus suppositional, no showing is made that the medical history recited was inadequate or inaccurate.

A psychiatric report was submitted by Dr. Nelson in November, 1963. This report, which will hereinafter be discussed more thoroughly, stated that appellant had an I.Q. in the mild defective range of

---

I. So referred to in the report. Presumably "thoracentesis" surgical puncture or tapping of the chest wall to remove fluids, was intended.

intelligence, and was fairly well oriented. With respect to appellant's claimed ailments, diagnosis was "best described as a psychoneurotic disorder with rather prominent hysterical symptoms and in an individual who apparently has had several attacks of 'anxiety' and who has emotional overlay to an old injury dating back as far as 1952."

The last medical report in evidence was a "pulmonary function study" performed by Dr. Williams. This study was essentially within normal limits as noted by the Hearing Examiner, except for the Maximum Deep Breathing Capacity Test, which Dr. Williams considered to be invalid because appellant became upset and was unable to cooperate.

A summary of the medical evidence thus establishes little uniformity of opinion regarding any serious physical impairment. Although Drs. Pigman and Williams diagnosed arthritis of the spine, Drs. Keith and Friesen not only made no such findings, but found that appellant had "good flexion * * * good extension and lateral movement" and that "his range of motion in his back, neck, upper extremities * * * are negative in findings." Dr. Keith ruled out post-concussion syndrome as diagnosed by Drs. Pigman and Williams. While these latter two doctors found some respiratory difficulties, the pulmonary function studies showed no serious deficiency. There was, however, a finding common to virtually all the medical reports considered, of psychoneurosis, a mental or emotional impairment which has been recognized by this court on several occasions as a basis for disability benefits. See Miracle v. Celebrezze, 351 F.2d 361 (6th Cir. 1965); Walston v. Gardner, 381 F.2d 580 (6th Cir., decided August 7, 1967).

A thorough discussion of psychoneurosis as a basis for Social Security benefits may be found in Judge McAllister's recent opinion in Branham v. Gardner, 383 F.2d 614 (6th Cir., decided September 8, 1967). In that case, it was noted that the term psychoneurosis as defined in "A Psychiatric Glossary" consists of:

"Emotional maladaptations due to unresolved unconscious conflicts. One of the two major categories of emotional illness, the other being the psychoses. A neurosis is usually less severe than a psychosis, with minimal loss of contact with reality. Thinking and judgment may be impaired. A neurotic illness represents the attempted resolution of unconscious emotional conflicts in a manner that handicaps the effectiveness of a person in living. Types of neuroses are usually classified according to the particular symptoms which predominate. Common types are:

"anxiety reaction: Characterized primarily by direct experience of anxiety, which may have an acute or gradual onset, with subjective uneasiness or apprehension out of proportion to any apparent external cause. The anxiety is uncontrollable * * *."

One further authority quoted by Judge McAllister in Branham, and in Miracle v. Celebrezze, supra, 351 F.2d at 376, might help place the mental impairment here under consideration in proper perspective.

"In 'Mental Abnormality and Crime' published as one of the English Studies in Criminal Science, by the Department of Criminal Science, Faculty of Law, University of Cambridge (MacMillan and Co., Ltd., London, 1944), Dr. D. R. MacCalman, M.D., Lecturer in Psychopathology at Aberdeen University, at p. 129, states:

'We must first distinguish from the normal anxiety which the average workman feels after injury and an anxiety neurosis proper. Anxiety of the normal type is bound to occur in a disabled workman, for his most precious possession, his health, has been threatened, perhaps permanently, and this constitutes, to himself and his family, a threat which is very real. The reduction in pay from his normal wage to thirty shillings weekly * * * means using up his savings or semi-starvation for his household. Even this meagre allowance may be further reduced

when he is certified fit for "light work". He tries to get work, but who will employ him in his disabled or semi-disabled condition? He becomes tense, irritable, sleepless, or, if he loses hope, listless, soured and indifferent. Such a state is unfortunately only too common; it is painful and serious, but it is not an anxiety neurosis. It is caused by an obvious and very real environmental threat to security; it would never occur if injured workmen were relieved of material anxiety, if they got proper rehabilitation treatment and were assured of employment in the future.

'Now, because this normal type of anxiety can be relieved by suitable work and economic security, a regrettable fallacy has crept into the attitude of doctors and lawyers toward neurosis cases. They see that the patient suffers from anxiety, mistake it for normal worry over his position, and think that he will be cured by work. This not only implies that a neurosis is something akin to laziness, or at least faint reluctance "to do an honest day's work", but confuses the condition with a consciously determined attitude of mind. Even patients themselves have been fooled into believing that work would cure them. Nothing is further from the truth. A neurosis can be cured only by psychotherapy * * *.' "

Dr. Williams and Dr. Keith both diagnosed psychoneurosis with anxiety reaction. It may here be assumed that there is at least some overlap between the terms "psychoneurosis, anxiety reaction" and "nervousness," as those terms are used by the respective doctors who examined appellant, for Dr. Pigman, who concluded that appellant suffered from nervousness and psychoneurosis (no specific type being mentioned), attributed his observation of tachycardia to nervousness, whereas Dr. Keith attributed this identical symptom to anxiety neurosis. Conversion reaction, which is more serious than anxiety reaction, was also diagnosed by Dr. Williams. "A Psychiatric Glossary" defines conversion reaction (also referred to as "somatic conversion") as "a reaction in which unacceptable unconscious impulses are converted into bodily symptoms. Instead of being experienced consciously, the emotional conflict is expressed by physical symptoms. In a broad sense, all neurotic reactions may be regarded as somatic, physiologic, or psychologic 'conversion,' but technically the term is usually restricted to its somatic aspects." Drs. Williams, Keith and Pigman all considered appellant's emotional (or nervous) disturbance to be "severe."

As is often the case, there is no question but that appellant has an impairment and the question before the Secretary was whether it should also be considered disabling. The Secretary discounted the severity of appellant's psychoneurotic disturbance largely on the basis of the psychiatric report of Dr. Nelson. After noting that appellant's behavior was "ultradramatic" during most of the interview, except for a brief interlude when appellant was observed leaving the office,[2] Dr. Nelson stated:

"I think the patient's diagnosis is best described as a psychoneurotic disorder with rather prominent hysterical

2. "Regardless of the results of damage or injury this individual has a very prominent emotional overlay going back as far as his injury in 1952. I think he has utilized these neurotic defenses rather significantly since that time. I think his behavior here is rather ultra-dramatic. It was interesting to watch him leave the office and try to go out of the suite of rooms through the toilet. He recovers himself very rapidly and with extreme agility corrects himself and walks out the right door after passing down the hall again. This type of spontaneous behavior is seen in the undramatized individual here today. The hysterical dramatization and the ultra-dramatic use of hands, facial movements, etc. is very prominent in this individual except for this brief interlude." Psychiatric Report of Dr. Nelson.

symptoms and in an individual who apparently has had several attacks of 'anxiety' and who has emotional overlay to an old injury, dating back as far as 1952. I don't think this individual is functioning up to capacity either in his school job or in his cemetary [sic] job. I think he has utilized neurotic defenses for a long time and it would be interesting to compare his work record prior to his injury with that of the last work in the cemetary [sic] and as a janitor in the school.

"I think the patient is in the moderate range of psychiatric disability. I think this disability may be more marked under other conditions of emotional stress, increased physical stress, etc. I think he will require some help, care and assistance from those about him including his friends, the public and the profession is [sic] he is to remain reasonably comfortable. I don't think we will see much change in this individual without treatment or rehabilitation in the next several months and years."

The Hearing Examiner's decision, which was accepted by the Secretary provided:

"This psychoneurosis, according to the psychiatrist, Dr. Nelson, put him in the moderate range of psychiatric impairment. According to Dr. Nelson's report, however, there were aspects of claimant's case indicative of a conscious effort on the part of claimant to impress upon the examining physician the seriousness of his condition. Dr. Nelson, for example, indicated that when claimant made a wrong turn in leaving his office, he was able to react promptly and remedy the situation, whereas during the interview with claimant, his reactions were extremely 'ultra-dramatic.' On these facts the hearing examiner is of the opinion that claimant's psychoneurosis is not of sufficient severity to cause him to be disabled within the meaning of the law."

Dr. Nelson's diagnosis of attacks of "anxiety" is in harmony with Dr. Keith's findings. With respect to Dr. Nelson's diagnosis of an "emotional overlay to an old injury," there is no indication as to whether this diagnosis corresponds to a finding of a "psychosomatic overlay" as that term is used, Miracle v. Celebrezze, supra, 351 F.2d at 375–377, or of a conversion reaction, as diagnosed by Dr. Williams, or of some other type of mental or emotional disturbance. In any event, appellant was placed in the "moderate range of psychiatric disability," notwithstanding his ultra-dramatic behavior throughout the examination, it being noted that the disability may "be more marked under other conditions of emotional stress, increased physical stress, etc." While the Secretary relied heavily upon the conclusion of Dr. Nelson that appellant was only in the moderate range of disability, appellant, in support of his position, emphasizes the language which followed this conclusion: "I think he will require some help, care and assistance from those about him including his friends, the public and the profession is [sic] he is to remain reasonably comfortable."

With respect to the pertinent question of how appellant's emotional impairment affects his ability to work, the Secretary, in the brief before this court, relies almost exclusively on Dr. Nelson's statement that "I don't think this individual is functioning up to capacity either in his school job or in his cemetary [sic] job." However, this should be read in context with the following statement that "I think he has utilized neurotic defenses for a long time and it would be interesting to compare his work record prior to his injury with that of the last work in the cemetary [sic] and as a janitor in the school." Because there is no question that appellant was a good worker prior to 1952, the evidence in the record affirmatively establishing this fact, it is difficult to comprehend the meaning of this latter statement by Dr. Nelson. Thus the inference which the Secretary here claims to have derived from the comment regarding appellant as not working up to capacity, that "the Appellant just simply

was not trying to perform his work," is, at best, entitled to no great weight.

A summary of the medical evidence discloses that of the six doctors whose medical reports were considered by the Secretary, including Dr. Combs, who examined and reported negatively on appellant's eyes, ears, nose and throat, the two doctors who attended appellant over a period of years considered him to be disabled, one doctor (although reporting minimal objective findings) opinioned that if appellant's medical history were accurate, "probably he is not able to be employed"; and the remaining two doctors concluded that appellant had a psychoneurotic disorder, the severity of which was placed as "severe" and "moderate" respectively. No doctor or lay witness denies that appellant actually experiences the symptoms of which he complains, and no witness, with the possible exception of Dr. Nelson, suggests that appellant is able to work.

■ The medical evidence here, considered as a whole, does not clearly establish that appellant's condition is caused wholly by a mental impairment, rather than a physical impairment, or a combination of both. It is generally recognized that pain and other symptoms may be caused by physical abnormalities, emotional disturbances, or both. Miracle v. Celebrezze, supra, 351 F.2d at 376; Lightcap v. Celebrezze, 214 F.Supp. 209, 215 (D.C.Pa.1962). The origin of such pain is, for purposes of ascertaining disability under the Social Security Act, immaterial, since pain resulting from the one source is just as real to a claimant and just as disabling as that resulting from the other. See Walston v. Gardner, supra. It is likewise immaterial that the exact cause of a disabling impairment be ascertained. As stated in Walker v. Gardner, 266 F.Supp. 998, 1002 (D.C.Ind.1967), cited with approval by this court in Branham v. Gardner, supra:

"The ultimate question in cases of this kind is not as to the exact causation of a disabling impairment. The ultimate questions are (1) does plaintiff have a medically determinable physical *or mental* impairment, etc., and (2) if so, does it render him unable to engage in any substantial gainful activity? For example, take the case of the individual who suffers from sheer physical weakness which makes it impossible to work; one doctor says he has a chronic coronary insufficiency, while another thinks his problem is emphysema. What difference? The Act concerns itself with results, not exact causes." (Original emphasis.)

Also, in Cox v. Celebrezze, 240 F.Supp. 1013 (D.C.Or.1965) the court remanded the case to the Secretary with directions to grant benefits where the record disclosed a "unanimity of opinion that plaintiff is, or may be, disabled, coupled with sharp, if not acrimonious, disagreement relating to cause. Dr. Hessel * * * decided plaintiff was not disabled by her vascular problems but that 'she might be on the basis of her own interpretation of those problems.' Dr. Brooksby, a psychiatrist, then found a disabling conversion reaction. Dr. Bond, though also finding a disability, asserted it stemmed from plaintiff's vascular problems and heatedly depreciated any attempt to accord it an emotional basis."

■ Substantial evidence means more than a scintilla; it is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Marion v. Gardner, 359 F.2d 175 (8th Cir. 1966). It has been noted that the Social Security Act is remedial in nature, and that a liberal construction in favor of disability, if such is reasonably made out, is therefore required. Polly v. Gardner, 364 F.2d 969 (6th Cir. 1966); Walston v. Gardner, supra.

■■ The record in the instant case contains substantial evidence in support of the conclusion that appellant is unable to "engage in any substantial gainful activity" in his present condition, and while there is some evidence in support of the Secretary's contrary finding, it is not, considering the record as a

whole, substantial evidence as defined above. "Substantial evidence does not sustain a Hearing Examiner's decision when it is based almost exclusively on a medical report of a physician making a single examination of a claimant, when two doctors who treated him over a period of years stated that he was totally incapacitated." Miracle v. Celebrezze, supra, 351 F.2d at 379.

In light of the foregoing, it is here determined that appellant has carried his burden of establishing that he is entitled to benefits under the Act, and the judgment of the District Court is therefore reversed, and the case remanded to the Secretary of Health, Education and Welfare with directions that appellant be granted a period of disability and disability benefits in accordance with the Social Security Act.