**Conie F. KING, Plaintiff,**

v.

**Wilbur J. COHEN, Secretary of Health, Education, and Welfare, Defendant.**

**No. C–139–G–68.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Sept. 17, 1969.

Jerry M. Shuping, Asheboro, N. C., for plaintiff.

William L. Osteen, U. S. Atty., of Greensboro, N. C., for defendant.

## MEMORANDUM OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff seeks judicial review, pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), of the final decision of the Secretary of Health, Education, and Welfare, denying her the establishment of a period of disability and for disability insurance benefits.

Plaintiff first filed an application for disability insurance benefits on March 21, 1967, claiming that she became unable to work in January of 1961, because of a "nervous condition." The application was denied by letter dated May 8, 1967. On June 12, 1967, plaintiff filed a request for reconsideration, and by letter dated August 19, 1967, she was advised that the initial disallowance was affirmed. Being dissatisfied with such determination, plaintiff filed a request for a hearing before a hearing examiner. The requested hearing was held on January 23, 1968, before Hearing Examiner John Porterfield. Plaintiff was represented at the hearing by Jerry M. Shuping, Esquire, Asheboro, North Carolina.

On March 18, 1968, Hearing Examiner Porterfield rendered his decision, finding that (1) plaintiff last met the special earnings requirement of the Act on March 31, 1966, (2) the evidence failed to establish that plaintiff's impairments prevented her from engaging in substantial gainful activity at any time prior to March 31, 1966, which had lasted or could be expected to last for a continuous period of at least twelve months, and (3) plaintiff was not under a "disability," as defined by the Social Security Act, either prior to or after the Social Security Amendments of 1965, at any time prior to March 31, 1966. The decision of the Hearing Examiner was that plaintiff was not entitled to a period of disability or to disability insurance bene-

fits under the provisions of 216(i) and 223, respectively, of the Social Security Act, as amended. On June 13, 1968, the Appeals Council denied plaintiff's request for review, thus making the decision of the Hearing Examiner the final decision of the Secretary.

On August 14, 1968, plaintiff instituted this action seeking judicial review of the final decision of the Secretary denying disability insurance benefits. Following the filing of an answer and a certified transcript of the administrative proceedings, the parties cross-moved for summary judgment.

Effective July 30, 1965, the Social Security Act was amended by defining the term "disability" to mean "* * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." The amendment had the effect of eliminating the requirement that the impairment be one which can be expected to be of long-continued and indefinite duration. Under the 1967 amendments to the Act, the statutory definition of "disability" was further clarified. These amendments provide that a claimant is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work," and the term "physical or mental impairment" is defined to be "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423. "[W]ork

which exists in the national economy" is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423. The 1967 amendments became effective on January 2, 1968, and apply to decisions in civil actions which had not become final before that date. Davis v. Gardner, 6 Cir., 395 F.2d 681 (1968); Daniel v. Gardner, 5 Cir., 390 F.2d 32 (1968). A reading of the legislative history of the amendments clearly discloses that Congress intended for the Secretary and the courts to be more restrictive in considering claims for disability insurance benefits, and intended that such claims be disallowed unless supported by clinical and laboratory findings, or other medically acceptable evidence.

The issue before the Court is the substantiality of the evidence to support the Secretary's findings on the issues before him. In Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964), the prescribed standard of judicial review is stated as follows:

"The prescribed standard of review, found in section 205(g) of the Act, 42 U.S.C.A. § 405(g), is as follows: '* * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, * * *.' Substantial evidence has been defined innumerable times as more than a scintilla, but less than preponderance. Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). The Secretary, and not the courts, is charged with resolving conflicts in the evidence, and it is immaterial that the evidence before him will permit a conclusion inconsistent with his. Snyder v. Ribicoff, 307 F.2d 518, 520 (4th Cir. 1962). If his findings are supported by substantial evidence, the courts are bound to accept them. Underwood v. Ribicoff, 298 F.2d 850 (4th Cir. 1962). In short, the courts are not to try the case de novo. At the same time, they must not abdicate

their traditional functions; they cannot escape their duty to scrutinize 'the record as a whole' to determine whether the conclusions reached are rational. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Boyd v. Folson, 257 F.2d 778 (3d Cir. 1958); 4 Davis, Administrative Law (1958) § 29.02, pp. 118–126. If they are, they must be upheld; but, if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary. Park v. Celebrezze, 214 F.Supp. 153 (W.D.Ark.1963); Corn v. Flemming, 184 F.Supp. 490 (S.D. Fla.1960). In such a circumstance the courts are empowered either to modify or reverse the Secretary's decision 'with or without remanding the cause for a rehearing.' 42 U.S.C.A. § 405 (g)."

The evidence before the Hearing Examiner consisted of the testimony of the plaintiff and her husband, the written reports of two physicians and two hospitals, and the affidavits of two individuals.

Briefly summarized, plaintiff testified that she was born on April 17, 1925; that she had one daughter 18 years of age living at home; that she worked as a sewing machine operator in a textile plant until 1961, when she was required to stop working because of her illness; that she was not able to do much housework or cook; that her kidneys had "acted up" for months at a time, and all she could do was lie down and go to the bathroom; that she was suffering from nausea and swelling in her stomach; that although she has had a high school education, she was unable to understand much of what she read; that she never went to movies, and seldom drove an automobile; that her daughter usually did the shopping because when she tried to go out she usually got sick and felt like she was going to "pass out"; that she had never received any type of vocational or specialized training; that she tried to go back to work at a school cafeteria in 1966 but had to stop after about 30 days on account of her health; that crowds smothered her and made her feel like she was going to "pass out"; and that she was then taking a "nausea pill" and a "nerve relaxing pill."

Plaintiff's husband testified that in about 1958 or 1959 his wife "got real nervous and got so she had to be out of work a lot"; that she finally got "so bad" he had to make her stop working; that she continued to get "worse all the time," and had not shown any improvement "at all"; that he had tried to do everything possible to help her, but nothing he did seemed to help "a great deal"; that his wife had "set the house on fire about four or five times" by putting something on the stove and going off and forgetting about it; that he had an "insurance job" so that he could be with his wife as much as possible because he did not think it was safe for her to be left by herself; and that since his wife stopped working in 1961 she had been unable to do the housework because of her illness.

Dr. Fred W. Graham, Jr., a general practitioner, filed reports on April 17, 1967, and February 2, 1968, covering his treatment of plaintiff since July of 1960. Dr. Graham reported that during the seven years he had treated plaintiff he had seen her in his office on at least 65 to 70 occasions, and had an equal or larger number of telephone consultations; that she had been hospitalized by him on two occasions, had been referred to psychiatric out-patient treatment and for psychiatric hospitalization; and that throughout the entire period of time she had remained continuously on "psychotropic drugs" without altering "the overall picture a great deal." Dr. Graham further stated that during this period of years plaintiff's symptoms, which consisted primarily of "urinary frequency, abdominal bloating * *( * excessive amounts of flatus, loose bowel movements, sensations of heat and sweating, usually accompanied by weakness," had

remained fairly constant; that plaintiff had fainted on several occasions; that repeated general physical examinations over the years had failed to reveal any specific organic basis for these symptoms; that plaintiff had been treated with a number of different medications over the years, and that her present program of Valium 5 mg. three or four times daily, with dramamine as needed for nausea, seemed to offer the most relief; that because of the obvious psychosomatic nature of her symptoms, attempts had been made at various times to get her involved in psychiatric treatment; that although she apparently had no real insight with respect to her problems, she had never objected to the psychiatric approach to her illness; that she was referred in February of 1963 to the Psychiatric Clinic at North Carolina Memorial Hospital in Chapel Hill; that it was their feeling that she demonstrated a passive-aggressive type of personality and that there was evidence of a life-long history of personality problems; that plaintiff thereafter continued to evidence multiple somatic complaints; that because of her symptoms, plaintiff agreed to a voluntary admission to the John Umstead Hospital at Butner, North Carolina, which was accomplished in June of 1963; that she remained there for a period of six weeks, and it was their feeling that she was suffering from a depressive reaction with a passive-aggressive type of personality; that she seemed to function fairly well in the hospital environment, although she continued to have some of the somatic complaints; that since her admission to the John Umstead Hospital, she had been unable to be without medication of some sort for more than a few days without a marked increase in sympathicotonia; that for the most part, plaintiff's symptoms were of a neurotic nature and involved repeatedly the same somatic complaints of weakness, dizziness, sweating, excessive flatus, bloating, and bladder irritability; that plaintiff had been unable to work since January of 1961, when she was hospitalized with a diagnosis of acute depressive reaction; that she had made several attempts at finding work, but on most occasions the approach of the possibility of a job had been sufficient to cause an increase of symptoms and complete disability again; that one brief attempt to work at a school cafeteria lasted less than a month, and was terminated because of the increase in symptoms of dizziness, weakness, and nausea; that on several occasions plaintiff attempted to sew and do seamstress work for friends and relatives at home, but had been unable to perform or complete most of these projects; that during the past year plaintiff's complaints had increased to the extent that she was usually unable to remain in the presence of more than two or three friends or relatives for more than brief periods of time without dizziness and nausea increasing to the extent that she felt she was going to faint; that she was unable to do her grocery shopping, take her clothes to the laundry, and things of this nature; that plaintiff's daughter apparently did most of the household chores as well as the grocery shopping; that plaintiff had evidenced increasing difficulty in her ability to make even what appeared to be relatively minor decisions in her life, asking her family to do such things as selecting her clothing for her; that during the course of his contact with plaintiff over a period of seven years it was his opinion that plaintiff "definitely" was not a malingerer; that it was highly unlikely that something as deeply ingrained as plaintiff's symptoms would be "altered at any time in the future by any sort of medications"; and that it also appeared that any type of psychiatric manipulations would be equally unfruitful. It was Dr. Graham's opinion that plaintiff had been unable to work since 1961, that she would never be able to return to regular employment, and that her behavior pattern and physical complaints would continue in about the same fashion for the remainder of her life. It was his further feeling that in the event plaintiff should be deprived of the support of her

daughter and husband, her situation would worsen considerably.

On July 30, 1963, the John Umstead Hospital reported plaintiff's admission on June 6, 1963, with the chief complaints of depression, agitation and crying spells, poor sleep, poor appetite, etc. A diagnosis was made of depressive reaction. After being treated with medication, plaintiff seemed to improve "a great deal in the hospital environment." She was encouraged to return to work when her daughter returned to school in the fall. She was discharged on July 27, 1963, to continue on medication for two months. It was the feeling of the hospital authorities that plaintiff was both mentally and physically competent.

On March 8, 1967, plaintiff was referred by Dr. Graham to Dr. Edward F. Doehne, a psychiatrist, for evaluation. In addition to her first visit, plaintiff saw Dr. Doehne on April 14, 1967, May 18, 1967, and July 6, 1967. Dr. Doehne sent Dr. Graham copies of all of his reports. Briefly summarized, Dr. Doehne reported that plaintiff had difficulty coping with the stresses in her life as a child, but apparently did fairly well until about 1960 when she quit work and had not been back to work since that time; that out-patient care, psychiatric hospitalization, and psychotherapeutic medications had not seemed to alter her problems during the past seven years; that plaintiff had very little insight or interest in interpersonal problems, and she was not considered to be a candidate for intensive psychotherapy. After increasing her medication, Dr. Doehne reported that her prognosis for going back to work was "quite guarded." Subsequent visits to Dr. Doehne did not alter his original impressions. However, in a letter dated July 21, 1967, transmitting his reports to the Division of Disability Determination, Raleigh, North Carolina, Dr. Doehne stated that he had not found any symptoms which would suggest a psychotic thought or mood disorder, or any disorder which would, in his opinion, "severely disable plaintiff's relationship with others, her job, or her home."

On December 31, 1968, Dr. Doehne wrote a letter to plaintiff's counsel clarifying his earlier reports to the Division of Disability Determination. In this letter, Dr. Doehne stated that the primary result of his examination was a finding that plaintiff was not psychotic, and that he did not feel she was "schizophrenic, manic depressive, suffering from severe brain disease, or a severe involutional depression." He did not feel that plaintiff was a malingerer, and expressed the possibility that she was suffering from some rare physical disease. From a psychiatric standpoint, Dr. Doehne stated that treatment had been tried without success and he would recommend that plaintiff be placed "in a Day Center or better yet, a Sheltered Workshop, where her performance could be observed and gradually encouraged."

Clarence Herbert Trogdon, the foreman of the textile mill in which plaintiff was employed at intervals from 1947 until January of 1961, stated that plaintiff had to stop work because she was too nervous on the job and her work suffered after the onset of her nervous condition. Mr. Trogdon further stated that plaintiff had tried to work, and wanted to work, but in his opinion she was unable to work.

Mrs. A. B. Cox, under whom plaintiff worked at the Asheboro Junior High School Cafeteria for about a month, stated in an affidavit that plaintiff was not able physically to do the work available to her at that time, although, in her opinion, plaintiff wanted to work.

In finding that plaintiff was not suffering from a severe mental or physical impairment at any time prior to March 31, 1966, when she last met the special earnings requirement of the Act, Hearing Examiner Porterfield made the following evaluation of the evidence:

"As indicated, the best evidence of record as to claimant's psychiatric condition is Dr. Doehne's report and the report from John Umstead Hospital. These evaluations were made by psychiatrists. The John Umstead

report found the claimant to be both mentally and physically competent. Dr. Doehne indicated that she was not suffering from any disorder which would severely disable her relationships with others, her job, or her home. *While the Hearing Examiner is aware of Dr. Graham's conclusions, they are not entitled to the weight generally given statements from a claimant's doctor since Dr. Graham is not a psychiatrist.* He is a general practitioner. The conclusions of Mrs. Cox and Mr. Trogdon are of little probative value in this connection." (Emphasis supplied).

■■ This is a classic example of the hearing examiner placing reliance "upon one portion of the record to the disregard of overwhelming evidence to the contrary." Thomas v. Celebrezze, 4 Cir., 331 F.2d 541 (1964). Dr. Graham, a graduate of the Duke University School of Medicine and a member of the American Academy of General Practice, saw plaintiff on at least 65 or 70 occasions over a period of seven years, and received a copy of all reports filed by the various hospitals and by Dr. Doehne. While admittedly not a psychiatrist, there is nothing in the record to suggest that Dr. Graham was not fully competent to correctly evaluate these reports. The relevant question is whether plaintiff has a medically determinable physical or mental impairment, and if so, does the impairment render her unable to engage in any substantial gainful activity. Based upon his numerous examinations and observations of the plaintiff, as well as the reports of Dr. Doehne and various hospitals in which plaintiff had been admitted, Dr. Graham was unequivocal in his belief that plaintiff had been unable to engage in any substantial gainful activity since 1961, that her condition had steadily deteriorated, and would probably never improve. There is no substantial evidence to the contrary. The significance of the report from the John Umstead Hospital is that plaintiff seemed to improve in a "hospital environment" after being treated with medication. She was encouraged to continue her medication after her discharge. Dr. Doehne reported that out-patient care, psychiatric hospitalization, and psychotherapeutic medication had not seemed to alter plaintiff's problems during the past seven years, and that her prognosis for going back to work was "quite guarded." The Hearing Examiner completely ignored these findings and appears to have based his conclusions solely upon a phrase contained in a letter written by Dr. Doehne to the effect that plaintiff's symptoms did not suggest a disorder which would, in his opinion, severely disable her "relationship with others, her job, or her home." Actually, Dr. Doehne does not state that plaintiff is physically or mentally competent to engage in any substantial gainful activity, but only that her disability does not relate to her association with others, her job, or her home. The fact that the exact cause of plaintiff's physical and mental impairments cannot be precisely determined is of no moment, since the Social Security Act concerns itself with results, not exact causes. Combs v. Gardner, 6 Cir., 382 F.2d 949 (1967). If plaintiff and her husband are to be believed, plaintiff has been totally disabled since 1961, and her inability to engage in any substantial gainful activity is supported by the affidavits of her two former employers. Both Dr. Graham and Dr. Doehne have stated that plaintiff is not a malingerer.

After reviewing the entire administrative record as certified by the Secretary, the Court is of the opinion, and finds as a fact, that the substantial evidence before the Secretary establishes the inability of plaintiff to engage in any substantial gainful activity by reason of medically determinable physical and mental impairments since she stopped working in 1961, which can be expected to result in death, or which have lasted, or can be expected to last, for a continuous period of not less than 12 months, and there is no substantial evidence to the contrary. In finding that there is no substantial evidence to support the findings and conclusions of the Secretary, the

Court has considered and applied the more restrictive definitions of "disability," "physical or mental impairment," and the definition of "work which exists in the national economy," as contained in the 1967 amendments to the Social Security Act.

Since the findings of the Secretary are not supported by substantial evidence, and the conclusions he reached are irrational, it follows that the motion of the plaintiff for summary judgment should be granted, and that the motion of the defendant for summary judgment should be denied.

A judgment will be entered accordingly.