Ann **WISSMILLER**, Plaintiff,

v.

Robert **H. FINCH**, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 5786.

United States District Court
W. D. Michigan, S. D.
Dec. 16, 1969.

Ryan, Boerema, Kail & Thompson, Grand Rapids, Mich., Jerry L. Thompson, Grand Rapids, Mich., of counsel, for plaintiff.

John Milanowski, U. S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

FOX, District Judge.

*Background and facts.*

This action is brought pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). On January 17, 1968, this court remanded the case to the defendant in order to acquire additional evidence. Hearing Examiner, Milton C. Ferguson, recommended that the claimant was entitled to a period of disability beginning June 2, 1957, and to disability insurance benefits. However, on November 8, 1968, the Appeals Council rejected this recommendation and held that the claimant was not entitled to a period of disability and disability insurance benefits.

The fifteen page opinion of the Hearing Examiner is summarized as follows:

The Examiner's review of the claimant's earning record established that she last met the earnings requirement for entitlement to disability benefits on June 30, 1961. In order for the claimant to be eligible for disability benefits, the disability must have had its onset at a time when she met this earning requirement, on or before June 30, 1961.

The precipitating accident occurred March 8, 1957, at Bagozzi's Chop House in Detroit. The petitioner fell, injuring her left arm, side and cervical vertebrae. She was initially confined to a bed for three and one-half weeks. She then managed to return to work for about two months, but because of increased pain, again left work in June of 1957. Since then she has not held any kind of gainful employment. Her testimony also discloses that her pain and discomfort disable her to the extent that she can do little or no housework and has difficulty with many other normal activities.

After receiving concurring lay testimony from the claimant's brother and husband, the Hearing Examiner restated the medical evidence that was available. She has been treated for this disability by numerous physicians with medication, heat, diathermy and osteopathic adjustments. These doctors have over the years given diverse diagnoses and opinions of her condition. Some report that she has chronic dorsal fibromyositis, or traumatic arthritis, or derangement of the spinal vertebrae. One doctor has changed his diagnosis from torn ligaments to generalized neuritis to osteoporosis to myelitis. Even though these diagnoses have been diverse, they have with but one exception found some physical impairment.

The Trial Examiner also recounted the testimony of two psychiatrists. Both found that the claimant possessed a mental disorder, but only one of them concluded that it disabled the plaintiff.

The Hearing Examiner reached the conclusion that the claimant was entitled to disability benefits under this statute. He found support for his position in the fact that only one doctor had concluded that the claimant had no physical disability. Moreover, this particular doctor examined the claimant only once, and that was in June 1958, over three years before the claimant last met the special earnings requirement for entitlement to disability insurance benefits under the Act. The other doctors never did agree on the exact nature of the claimant's

disability, but the Hearing Examiner felt that there was ample medical testimony to support the uncontradicted lay testimony that the claimant is unable to work because of the constant pain she had endured since 1957.

The Hearing Examiner's recommendation that the claimant was entitled to a period of disability insurance benefits was not adopted by the Appeals Council. Instead the Appeals Council concluded that the medical history of the claimant prior to June 30, 1961, showed "that evidence of any significant physical or organic impairment" was "meager." The Appeals Council also recognized that pain may be an important factor in causing functional loss. Since pain by its very nature is hard to evaluate and since there was no medical evidence of abnormal findings which may have indicated severe pain, the Appeals Council concluded that the claimant's subjective complaints were all out of proportion with the clinical and laboratory findings that have been reported. Thus, the Appeals Council concluded that "the claimant had only a slight physical impairment which would not have prevented her from engaging in her former work as a waitress" before June 30, 1961.

The Hearing Examiner's conclusion that the claimant was psychologically impaired was also rejected by the Appeals Council. Though there was testimony and medical evidence to the effect that the claimant was presently inflicted with a severe psychiatric disability, the Appeals Council concluded that no medical evidence or lay testimony established that this psychiatric impairment existed on or before June 30, 1961.

*Issue.*

The only issue before the court is whether or not the decision of the Secretary, adverse to the claimant, is supported by substantial evidence in the record as a whole.

The Appeals Council failed to find that the plaintiff had a psychological disability within the meaning of the Social Security Act. The evidence showed that one neuropsychiatrist, Dr. Adolf Dasler, specifically found the claimant to be suffering from two psychiatric illnesses and then concluded: "I am of the firm belief that she is now incapacitated for any work and probably has been since June 4, 1957." Another psychiatrist, Dr. Kenneth Nickel, also examined the claimant. Though he observed the same characteristics that Dr. Dasler did, and found ample evidence that the claimant is possessed of a personality disorder, personality trait disturbance and passive-aggressive personality, he concluded that she was not mentally disabled.[1]

This conflict in expert testimony, however, is sufficient for one to reasonably draw the inference that the claimant did not have a mental disability.

Even if this court discounts Dr. Nickel's testimony because of his social philosophy,[2] the fact that Dr. Dasler did not examine the claimant until 1968, permits the Secretary to reasonably infer that the claimant has not proven that she was psychologically disabled on or before June 30, 1961. This is particularly true in light of two additional facts.

First, it is clear that the claimant has the burden of proving that a disability existed when she was last covered by the Act. Section 223(d) (42 U.S.C. § 423(d)) provides:

"(5) An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."

Secondly, almost all of the evidence indicating that the claimant is highly nervous and has a mental disorder only relates back to 1964–1965, when she be-

---

1. He did not state any conclusion on whether he thought the claimant was physically disabled or employable.

2. Compare Dr. Nickel's testimony in Wilk v. Finch, C.A. 5951 (Tr. p. 92) with Dr. Nickel's instant conclusions ·(Tr. pp. 185–186).

gan to prosecute this claim for disability insurance. The Secretary could reasonably have inferred from these facts that the claimant was not mentally disabled on or before June 30, 1961. Thus, this aspect of the Secretary's decision is supported by substantial evidence and is affirmed by this court.

The Secretary also concluded that the claimant was not physically disabled on or before June 30, 1961. There is no dispute to the testimony that the claimant had worked almost continually from 1937 to the time of her accident in 1957, and that she has not worked since June of that year. Uncontradicted evidence also shows that the claimant has not been able to continue to do household chores or other normal activities. The reason given for this marked decrease in activity is the pain and discomfort the claimant suffers as a result of the 1957 fall.

■ Since an individual's pain must be considered by the Secretary in determining whether the individual is disabled, Sayers v. Gardner, 380 F.2d 940, 948, 23 A.L.R.3d 1014 (6th Cir. 1967), the Secretary's decision was in effect holding that the claimant's pain was insufficient to prevent her from engaging in her former work. More specifically, the Appeals Council stated that "her subjective complaints are all out of proportion to the clinical and laboratory findings that have been reported." (Tr. p. 8.)

The Secretary seems to rely on a regulation promulgated under the 1967 Amendments to the Social Security Act, as the basis for discounting the claimant's testimony. (20 C.F.R. § 404.-15026).

" * * * Medical considerations alone can justify a finding that the individual is not under a disability where the only impairment is a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or combination of slight abnormalities." Reg. 4. Sub Part P, § 404.-1502(a).

The relevant portions of 1967 Amendments provide that:

"A 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 223 of the Social Security Act (42 U.S.C. § 423).

The effect of the above quoted regulations is to permit the Secretary not only to discount but even to ignore the claimant's own testimony as to her condition if medical evidence shows only a "slight abnormality, or slight abnormalities."

■ Even if this court assumes that this regulation is valid, it should be construed narrowly in light of the over-all purpose of the Social Security Act. As stated by Senior Circuit Judge McAllister in Sayers v. Gardner, supra, at 942:

"[1] Because of the repeated necessity of reversing the Secretary in these cases, we should go back to the origins of the statute and consider first things first. The Act was adopted pursuant to a public policy unknown to the common law, designed for the protection of society, and enacted to alleviate the burdens which rest on large numbers of the population because of the insecurities of modern life, particularly those accompanying old age, unemployment, and disability, through the establishment in advance of a provident fund for the needy worker, out of which he will be paid disability benefits, annuities, and compensation; and there is no question that the Social Security Act is constitutional.

\* \* \* \* \*

"The Social Security Act brought with it, among other provisions, the right to disability benefits for workers who have become disabled from doing the work—usually the hard manual work—that they have done during their lives."

In Miracle v. Celebrezze, 351 F.2d 361 (6th Cir. 1965), the court quoted Judge Brown in Butler v. Flemming, 288 F.2d 591, 595 (5th Cir. 1961):

"If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark.1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does 'more than hurt' so that it 'substantially aggravate[s] his malady,' 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act." 351 F.2d at 373–374.

Finally, in Combs v. Gardner, 382 F.2d 949 (6th Cir. 1967), the court stated:

"It has been noted that the Social Security Act is remedial in nature, and that a liberal construction in favor of disability, if such is reasonably made out, is therefore required." 382 F.2d at 956.

█ Having the purpose and goal of the Social Security Act in mind, the medical evidence clearly indicates that the claimant was suffering from more than a "slight abnormality or combination of slight abnormalities" within the meaning of this regulation.

As was noted above, the claimant has seen many doctors over the past thirteen years, some for treatment and others for single examinations. In the period prior to June 30, 1961, she saw her brother, Dr. John Pechacek, D.O., most frequently. She visited him regularly from the date of the accident to 1962. His report states that his sister had developed traumatic arthritis due to the accident in 1957.

The other doctors who examined the claimant prior to 1961 saw her at least three years prior to the last date she qualified under the Act. Of these only Dr. MacMillan, M.D., who saw the claimant on June 9, 1968, concluded that there was no physiological disability. Dr. Maguire, M.D., saw the claimant on November 14, 1957, and reported that "there was evidence of minimal degenerative arthritis of the mid-dorsal spine." Dr. Heleotis, D.O., saw the claimant on July 11, 1958, and diagnosed her condition as "chronic dorsal fibromyositis." The only other doctor who examined the claimant close to the June 30, 1961 date was Dr. Emery, D.O., who began treating her on August 1, 1962, and continued to see her until January 1967. During this period this doctor treated her seventy-one times for a condition variously diagnosed as "torn ligaments shoulder girdle and neck;" "generalized neuritis;" "1. Osteoporosis. 2. Muscular tension neck, shoulder, upper dorsal. 3. Nerves;" "1. Myalitis along the muscles of spine. 2 Nerves;" and "Chronic myelitis."

In light of the purpose of the Act, the claimant's condition up to and including June 30, 1961, as described by the above five medical reports, should not be considered a "slight abnormality." Dr. Pechacek and Dr. Emery were the only doctors to see her more than once. Also, they were the only ones to see her near June 30, 1961. Both considered her disability to be so serious that they continued to see her and apply corrective physical therapy, manipulation, heat, diather-

my, ultrasound, anti-rheumatic and arthritis injections and pills. This medical testimony indicates that the claimant's condition cannot be described as a "slight abnormality."[3] Thus, it would follow that the Secretary improperly relied upon the above quoted regulation as his basis for discounting the claimant's uncontradicted testimony that she has suffered great pain and discomfort since 1957.[4]

Looking then at the whole record, the Secretary's conclusion that the claimant was not physically disabled on or before June 30, 1961, is not supported by substantial evidence. When the above recited medical testimony is coupled with the testimony of the other four doctors who examined her between 1963 and 1965 and the uncontradicted lay evidence of the great pain the claimant suffered, it is unreasonable for the Secretary to have inferred that she was not disabled on or before June 30, 1961.

Each of these four doctors diagnosed varying degrees of physical impairment in the spinal area. She was seen and treated by A. W. Carlson, D.C. (Ex. 21) from December 14, 1963 to October 29, 1964 for a condition diagnosed as "misaligned vertebrae causing pressure or strain on spinal nerves with resulting pain and muscle spasms." She then was seen and treated by William A. Firth, D.C., from October 30, 1964 to November 24, 1964 (Ex. 22) for a condition diagnosed as "Subluxation of vertebrae upper and lower dorsal region and lumbar region of spine." She was seen on September 13, 1965 by Orthopedic Surgeon Alfred Swanson (Ex. 26) and his report indicates that "she has limitation of motion in the cervical spine in both flexion-extension rotation" and that

---

3. In Teague v. Gardner, 281 F.Supp. 43, 48 (E.D.Tenn.1968), Chief Judge Taylor stated that the testimony of a treating physician "is entitled to more consideration than the testimony of doctors who merely examine."
See also, Miracle v. Celebrezze, 351 F.2d 361, 379 (1965); Combs v. Gardner, 382 F.2d 949 (1967); and Colwell v. Gardner, 386 F.2d 56, 70–71 (1967), all decided by the Sixth Circuit.

4. In Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497, the Supreme Court stated the purpose of the Federal Employers' Liability Act:
The Federal Employers' Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations. Not all these costs were imposed, for the Act did not make the employer an insurer. The liability which it imposed was the liability for negligence. But judges had created numerous defenses—fellow-servant rule, assumption of risk, contributory negligence—so that the employer was often effectively insulated from liability even though it was responsible for maintenance of unsafe conditions of work. The purpose of the Act was to change that strict rule of liability, to lift from employees the "prodigious burden" of personal injuries which that system had placed upon them, and to relieve men "who by the exigencies and necessities of life are bound to labor" from the risks and hazards that could be avoided or lessened "by the exercise of proper care on the part of the employer in providing safe and proper machinery and equipment with which the employee does his work."[1]

1. H.R.Rep. No. 1386, 60th Cong., 1st Sess. 2 (1908).
That purpose was not given a friendly reception in the courts. In the first place, a great maze of restrictive interpretations were engrafted on the Act, constructions that deprived the beneficiaries of many of the intended benefits of the legislation. * * * And so it was that a goodly portion of the relief which Congress had provided employees was withheld from them. 336 U.S. at 68, 69, 69 S.Ct. at 420–421.
Similarly, the Sixth Circuit has noted the unfriendly reception that the Secretary and his delegates have given the disability benefit provisions of the Social Security Act. It has continually re-emphasized the manifest humanitarian purpose of the Act, and the need for all parties to liberally construe the Act in favor of disability, if such is reasonably made out. Sayers v. Gardner, 380 F.2d 940, 23 A.L.R.3d 1014 (1967); Miracle v. Celebrezze, 351 F.2d 361 (1965); Combs v. Gardner, 382 F.2d 949 (1967); Branham v. Gardner, 383 F.2d 614 (1967); Polly v. Gardner, 364 F.2d 969 (1966).

x-rays of the cervical spine show "some osteo-arthritic changes especially severe in the C6–7 area with bridging and some ensmalling of the vertetral foramina in this area." She was seen on June 18, 1965 by Clair E. Basinger, M.D. (Ex. 29), whose full-time specialty is Thoracic Surgery and Cardiovascular Disease. Dr. Basinger reported that he "felt this patient probably could not be gainfully employed unless orthopedic treatment or correction could be of benefit to her."[5]

The lay testimony clearly indicates that the claimant has endured great discomfort over the last thirteen years, and that this condition has prevented her from working or leading a normal life. Moreover, the claimant's very active work record for twenty years before her accident and the motivation to lead an active life to which it attests substantiate the evidence that she is unable to work due to her physical disability and not any bad faith desire to receive insurance benefits.

From the evidence presented in this case, the Secretary's decision is not supported by substantial evidence. Almost the entire record supports the Hearing Examiner's conclusion—the claimant was disabled, as defined by the Act—and recommendation—the claimant was entitled to a period of disability and to disability insurance benefits.

Considering, then, the totality of the evidence, the Appeal Council's findings are insubstantial under the mandate of liberal construction, fostered by the humanitarian purpose and public policy of the Act.

5. Branham v. Gardner, 383 F.2d 614 (6th Cir. 1967), quoted approvingly from Walker v. Gardner, 266 F.Supp. 998, 1002, 1003 (S.D.Ind.1967), where the court was also faced with diverse medical diagnoses:

The ultimate question in cases of this kind is not as to the exact causation of a disabling impairment. The ultimate questions are (1) does plaintiff have a medically determinable physical *or mental* impairment, etc., and (2) if so, does it render him unable to engage in any substantial gain-

ful activity? For example, take the case of the individual who suffers from sheer physical weakness which makes it impossible to work; one doctor says he has a chronic coronary insufficiency, while another thinks his problem is emphysema. What difference? The Act concerns itself with results, not exact causes.
383 F.2d at 630.
Similarly, in the instant case there is no agreement on causation, but the uncontradicted result is that the claimant experiences severe pain.